### RESURRECTION GOLD MIN. CO. v. FORTUNE GOLD MIN. CO.

(Circuit Court of Appeals, Eighth Circuit. April 14, 1904.)

#### No. 1,789.

**1. BOUNDARIES—WHEN CALLS AND COURSES AND DISTANCES CONFLICT.**

In cases of conflicts between monuments called in a conveyance and the courses and distances there noted, the former, if standing in their original positions, prevail.

If monuments called have been lost or removed, the places where they were originally set may be shown by parol or documentary evidence, and, if proved to the satisfaction of the jury by a fair preponderance of testimony, they prevail over the courses and distances.

If the monuments called have been lost or removed, and their original locations are not proved, the courses and distances control the description, and must be followed in its application to the land.

**2. SAME—PAROL EVIDENCE TO CHANGE CALLS OF MONUMENTS.**

Parol evidence is incompetent to substitute in a conveyance a call for another monument in the place of the call for the original monument there contained.

A round stake four inches in diameter, set loosely six inches in the ground between two convenient reference points within four feet of it, with two blazes upon it, and an inscription with a lead pencil of the figures "3-2309" upon the later blaze, does not fill the description of a post four inches square, with the figures "3-2309" cut into it, set firmly in the ground, where no reference points are available.

**3. CROSS-EXAMINATION—RIGHT OF—DISCRETION IN ALLOWING.**

A full and fair cross-examination of a witness upon the subjects of his direct examination is a right, and not a privilege, of the party against whom he is called, and its denial or substantial restriction is reversible error.

The allowance of cross-examination is discretionary only, after the right has been fairly exercised.

---

¶ 1. See Boundaries, vol. 8, Cent. Dig. § 18.

**4. SAME—LIMITED TO SUBJECTS OF DIRECT EXAMINATION.**

It is the general rule in the federal courts that the cross-examination of a witness should be limited to the subjects of his direct examination.

**5. SAME—MAY ELICIT AFFIRMATIVE DEFENSE.**

Where a witness for the plaintiff has disclosed on his direct examination a part of a conversation or transaction, the fact that the entire conversation or transaction constitutes an affirmative defense is no bar to its disclosure by cross-examination.

**6. SAME—DENIAL PREJUDICIAL.**

Prejudice is presumed from the denial or undue restriction of a cross-examination. It is no answer that the cross-examiner could call the witness or other witnesses to prove the facts he seeks. He is entitled to bind his adversary by proof of the facts by the latter's witness.

**7. SAME—GENERAL RULE.**

The general rule is that error produces prejudice, which may not be disregarded, unless it appears beyond a doubt that it did not prejudice, and could not have prejudiced, the party who assigned it.

**8. WILLFUL TRESPASSER—DEFINITION—NEGLIGENCE AS EVIDENCE OF.**

One who takes the ore of another from his land without right, either recklessly or with the actual intent so to do, is a willful trespasser. One who takes such ore without right, but inadvertently and unintentionally, or in the honest belief that he is exercising his own right, is not a willful trespasser, and may avail himself of the lower measure of damages.

Mere negligence, of the character described by the word "inadvertence," in ascertaining the limits of the lands or rights of the owner, will not alone sustain a finding of that recklessness, fraud, bad faith, knowledge, or intent requisite to establish a willful trespass, but it is competent evidence upon the issue of willfulness or innocence.

An intentional omission, however, to exercise care to ascertain such limits, for the purpose of maintaining ignorance regarding them and trespassing upon them, or a reckless disregard of them, is as fatal to the claim of a trespasser to limit damages to the lower measure as knowledge of the owner's rights and an intent to violate them.

Thayer, Circuit Judge, dissenting in part.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Colorado.

Gerald Hughes (Charles J. Hughes, on the brief), for plaintiff in error.

Clayton C. Dorsey (Willard Teller, on the brief), for defendant in error.

Before SANBORN, THAYER, and HOOK, Circuit Judges.

SANBORN, Circuit Judge, delivered the opinion of the court.

This is an action of trespass brought by the Fortune Gold Mining Company, a corporation, the lessee of the Fortune lode mining claim, against the Resurrection Gold Mining Company, a corporation, for the intentional removal of ore from the Fortune claim. The plaintiff alleged, and the defendant denied, that the former was the lessee from the owner and was in the possession of the Fortune lode mining claim, and that the defendant intentionally and willfully removed therefrom ore of the value of $100,000. The real issue between the parties, however, was whether the boundary of the Fortune claim at corner No. 3 was at the point where the courses and distances recited in the patent located it, or at a place about 28 feet farther northwest. If it was at the

former point, the trespass of the defendant was inconsiderable; but if, as the plaintiff claimed and the jury found, it was in the latter place, ore of the value of several thousand dollars had been extracted from the plaintiff's claim by the defendant.

The plaintiff's title rested upon a patent issued in 1894, and the description in that patent upon the survey for patent made in January, 1882. The original monuments erected by the surveyor at corners 1 and 2 of the Fortune claim, when he surveyed it for patent, were standing upon the ground at the time of the trial. The monument erected at corner 4 had disappeared. The plaintiff insisted that a round stake, with two blazes upon one side of it, loosely placed in the earth, and surrounded by a mound of stones at a place about 28 feet northwest of the point where the courses and distances run from the known corners 1 and 2 located corner 3, was the original monument erected by the surveyor to mark that corner, and that it was in the same place where the surveyor put the original monument in January, 1882. The patent and the field notes on which the patent was based were introduced in evidence by the plaintiff. The recitals of the patent, so far as they are material to the questions in this case, are that it is a grant of the Fortune lode mining claim known as "Lot No. 2,309"; that this claim is bounded as follows: Beginning at corner No. 1, a post four inches square, marked 1–2309, thence south 1 degree 30 minutes west 300 feet to corner No. 2, thence south 88 degrees 48 minutes east 1,465 feet to corner No. 3, thence north 1 degree 30 minutes east 300 feet to corner No. 4, thence north 88 degrees 48 minutes west 1465 feet to corner No. 1 at the place of beginning; and that the lot No. 2,309 extended 1,465 feet in length along the Fortune vein or lode. The field notes recited that a post marked each corner, that at corner No. 3 there were "no reference points available," and that "all corner posts are 4″ square x 4 ft. long set 2 ft. in ground, and have cut into them the respective number of the corner and number of the survey. No bearing ties available from any of the corners." The amended field notes recite that there was at corner No. 1 "a post 4 ins. square, 4 ft. long, set 2 ft. in ground and marked 1–2309," at corner No. 2 "a post 4 ins. square, 4 ft. long, set 2 ft. in ground and marked 2–2309," at corner No. 3 "a post 4 ins. square, 4 ft. long, set 2 ft. in ground and marked 3–2309," and at corner No. 4 "a post 4 ins. square, 4 ft. long, set 2 ft. in ground, and marked 4–2309." Neither the patent nor the field notes describe a mound of stones as a part of any of the monuments. The original monuments which stand at corners 1 and 2 are posts 2½ feet high, about 5 inches square, set firmly in the ground, with the figures "1–2309" and "2–2309" cut into them respectively about ⅛ of an inch. The stake which the plaintiff claims is the original monument at corner No. 3 is round, 4 or 5 inches in diameter, about 3 feet high, and it sets loosely about 6 inches in the ground, and is surrounded by a mound of stones. It is blazed on one side. A partial attempt has been made to square it at the top. No figures are cut into it. Some one has whittled or hewn off one side of the blaze, and upon this new blaze has faintly written with a lead pencil the figures "3–2309."

The owner of the claim from whom the plaintiff derives its lease testified that he was present when the survey for patent was made, that

four stakes of about the same character were set at the four corners, that stones were piled around them, that he did not notice and does not know how they were marked, that he does not know how the round stake at corner No. 3 is marked, that he thinks the round stake is the original post set there by the surveyors, that it looks to him like it, and that it is in the same location in which the original post was set. He testified that when the original post was placed at this corner by the surveyor in 1882 there was a stump 18 inches in diameter and 12 or 14 feet high 18 inches north of the post, and another large stump 3 feet south of the post, and that the surveyor and his assistants measured the distances from the post to these stumps and blazed them. The stumps still remain upon the ground. No other witness testified that he knew the round stake to be the original post. Several stated that they had seen the stake, in the place where it now stands, at various times between the survey in 1882 and the time of the trial. One of the defendant's witnesses testified that in 1896 he found a stake at this corner about 2½ feet high and 5 or 6 inches square, but that on July 9, 1898, he looked for it at the same place but could not find it. No other material evidence upon the issue of the identity of the round stake with the original post set at corner 3 appears in the record.

It is assigned as error that in this state of the evidence the court refused to grant the request of the defendant to instruct the jury "that a post which is round, blazed on one side, and bearing lead-pencil marks or figures, not set in the ground, but set up in a mound of stones, does not fulfill the description of a post which calls for a post four inches square, four feet long, set two feet in the ground, and having the number of the corner and the number of the survey cut into said post," and that the court on the contrary charged the jury "that a stake such as described by the witnesses in this case as located at corner No. 3 is sufficient to meet the calls of the patent." The description of the land in controversy in the patent is copied from and founded upon the field notes of the survey of the claim which were introduced in evidence by the plaintiff, so that, as far as the question here presented is concerned, the case stands as though the field notes were written into the description of the patent.

Before entering upon the discussion of the specific issue to which our attention is first challenged, it may be well to recur for a moment to the rules for the application of a description in a patent or in a deed to the land to which it refers. A plain and unambiguous description in a written conveyance can no more be contradicted or modified by parol evidence than any other part of a written agreement. It is only when a patent ambiguity arises in the description itself, or in the application of it to the land, that evidence aliunde becomes admissible for the purpose of fitting the description to the ground to which it refers and of removing uncertainty. When the monuments called for in a conveyance do not correspond with the courses and distances there recited, such an ambiguity necessarily arises, and parol and other evidence is then admissible to remove it. In cases of this character the original monuments called by the patent, if they still remain in place, prevail over the courses and distances noted in the description. If the monuments called have been lost or removed, the places where they were

originally located may be shown by parol or other competent evidence, and, if proved to the satisfaction of the jury by a fair preponderance of evidence, these original locations will prevail over the courses and distances, and control the application of the description to the land.   Robinson v. Kime, 70 N. Y. 147, 154; Lodge v. Barnett, 46 Pa. 485; Wendell v. People, 8 Wend. 190, 22 Am. Dec. 635; Jackson v. Widger, 7 Cow. 723; Pernam v. Wead, 6 Mass. 131; Lessee of McCoy v. Galloway, 3 Ohio, 282, 283, 17 Am. Dec. 591; Bagley v. Morrill, 46 Vt. 94, 100; Opdyke v. Stephens, 28 N. J. Law, 83, 89.   If the monuments are lost or removed and their original locations are not established by competent proof, the courses and distances prevail, and control the description.

Parol evidence, however, is incompetent to substitute a different monument for one clearly called by a deed or patent, or by the survey upon which it is founded, because that course of proceeding would violate the settled rule that written contracts may not be contradicted or modified by oral evidence.   It is not competent to create an ambiguity by changing the written description by parol evidence, and then to proceed to apply the changed description to the land by the rules of law and evidence to which reference has been made, which are applicable only to conveyances which are in themselves ambiguous, or become so in their application to the ground.   Bruckner's Leesee v. Lawrence, 1 Doug. 19, 25, 27–36; Bagley v. Morrill, 46 Vt. 94, 100; Drew v. Swift, 46 N. Y. 204, 209; Pollard v. Shively, 5 Colo. 309, 315; Lessee of McCoy v. Galloway, 3 Ohio, 282, 283, 17 Am. Dec. 591; Claremont v. Carlton, 2 N. H. 369, 9 Am. Dec. 88.

The patent in the case before us disclosed no ambiguity, and presented no conflict between its courses and distances and any monument for which it called at corner No. 3, because it specified no monument at that corner.   There was therefore no excuse for parol evidence on the face of the patent, and the courses and distances which it contained were prima facie controlling and consistent with themselves.   Thereupon counsel for the plaintiff introduced in evidence the field notes of the survey, and read them into the patent for the purpose of raising the requisite ambiguity upon which its cause of action rests.   These field notes recite that the monument at corner No. 3 was "a post 4 ins. square, 4 ft. long, set 2 ft. in ground, marked 3–2309," that these numbers were cut into the post, and that it stood at a place where no reference points were available.   This description imported no ambiguity into the patent, unless the post there described could be found, or unless its original location could be proved to be at some other point than at the place where the courses and distances located the corner.   In order to prove that there was such a stake at such a place, and in order to create the ambiguity which did not otherwise exist, the plaintiff introduced testimony that a round stake 4 inches in diameter, with two blazes, the later on the side of the earlier, with the figures "3–2309" written in pencil upon it, but without any figures cut into it, stood between two available reference points 28 feet northwest of the position of the corner as indicated by the courses and distances, and the court instructed the jury that the latter stake satisfied the description of the corner post.   Stakes in themselves are generally similar.   The descrip-

tion contained in the word "stake" or the word "post" segregates no stake or post from others of similar character. The distinguishing characteristics of the post described by the surveyor in his field notes were not the material of which it was made, its length, or its size. They were its peculiar shape, and especially the marks he put upon it for the express purpose of identifying it and setting it apart from all others. The post was squared, and the figures "3–2309" were cut into it to forever distinguish it from all other pieces of wood, just as these marks on the stakes at corners 1 and 2 have clearly and conclusively identified them. If this round blazed stake with its fading pencil marks upon it stood near the post at corner 2, no one would hesitate for a moment to say that it was not the square post with its carved figures described in the surveyor's notes. The post at corner 3 described in the notes was square. That which the owner of the land found and testified concerning was round, with two blazes of evidently different dates upon one side of it. The figures "3–2309" had been cut into the former. No figures had been cut into the latter, but the figures "3–2309" had been written upon it with a lead pencil. The former stood where no reference points were available; the latter where two excellent references were within four feet of it. The latter had none of the distinguishing marks and did not satisfy the description of the former, and the instruction of the court to the contrary cannot be sustained. Its effect is to import an ambiguity into a conveyance where none existed before, by changing the written description in the patent and field notes by oral evidence. Its effect is to strike out of the patent and field notes the description of the square post marked by the figures "3–2309" cut into it, and to write into them the description of the round blazed stake inscribed with the figures "3–2309" by means of a lead pencil, and in this way to violate the settled rule that written conveyances may not be modified or contradicted by parol.

The next question presented relates to the cross-examination of McNeece, the owner of the claim. He testified on his direct examination that he was present and saw the stake set when the survey for patent was made, that the round stake with the blazes and pencil marks is in the same place in which the surveyor set the original post for corner No. 3, and as follows:

"Q. Describe the manner in which the monuments were set. A. We drove down a stake here [indicating on map], and piled a pile of rock around it; the same with this stake here, and the same with No. 3, and the same with No. 4."

After he had testified on cross-examination that the original monument which marks corner number 4 of the Kokomo claim, which the field notes of the Fortune claim declare bears north 2 degrees 5 minutes east 196 feet from corner No. 4 of the Fortune, is still standing, and after he had testified that, when the survey of the Fortune was made, the surveyors measured the distance from corner No. 3 to two stumps near it and blazed them, he was asked on cross-examination, "Did they measure the distance from that corner No. 4 at the time they set it in the patent survey to corner No. 4 of the Kokomo?" and the court sustained an objection to the question, and refused to permit the witness to answer it. The fact was that if corner No. 4 of the Fortune was 196 feet distant from corner No. 4 of the Kokomo, then that corner was

about 300 feet from the place where the defendant claimed, and the courses and distances located corner No. 3, and about 325 feet from the round stake which this witness had testified marked that corner. Hence, if the surveyors measured the distance from corner No. 4 of the Fortune to corner No. 4 of the Kokomo, that fact tended much more strongly to show that McNeece was mistaken in his testimony to the effect that the round stake was at the location of the original monument than if the surveyors had simply calculated that distance. Many arguments are urged upon us by counsel for the plaintiff for the purpose of sustaining this ruling. They say that permission to answer this question was discretionary with the court below, and that its refusal was no abuse of discretion; that the answer to the question would have established an affirmative defense; and that the refusal to permit the introduction of the answer was not prejudicial to the defendant because it might have made the owner of this property its own witness and then have asked him the same question; and that in any event the expected testimony was only cumulative. But a fair and full cross-examination of a witness upon the subjects of his examination in chief is the absolute right, and not the mere privilege, of the party against whom he is called, and a denial of this right is a prejudicial and fatal error. It is only after the right has been substantially and fairly exercised that the allowance of cross-examination becomes discretionary with the trial court. Gilmer v. Higley, 110 U. S. 47, 50, 3 Sup. Ct. 471, 28 L. Ed. 62; Chandler v. Allison, 10 Mich. 460, 473; Heath v. Waters, 40 Mich. 457, 471; Sperry v. Moore's Estate, 42 Mich. 353, 361, 4 N. W. 13; Martin v. Elden, 32 Ohio St. 282, 287; Wilson v. Wagar, 26 Mich. 452, 456, 458; Reeve v. Dennett, 141 Mass. 207, 6 N. E. 378; Taggart v. Bosch (Cal.) 48 Pac. 1092, 1096; New York Iron Mine v. Negaunee Bank, 39 Mich. 644, 660; Jackson v. Feather River W. Co., 14 Cal. 19, 24; Wendt v. Chicago, St. P., M. & O. Ry. Co., 4 S. D. 476, 484, 57 N. W. 226.

The converse of this rule is equally controlling. In the courts of the United States the party on whose behalf a witness is called has the right to restrict his cross-examination to the subjects of his direct examination, and a violation of this right is reversible error. If the cross-examiner would inquire of the witness concerning matters not opened on the direct examination, he must call him in his own behalf. Houghton v. Jones, 1 Wall. 702, 706, 17 L. Ed. 503; Montgomery v. Ætna Life Ins. Co., 97 Fed. 913, 916, 38 C. C. A. 553, 557; Safter v. U. S., 87 Fed. 329, 330, 31 C. C. A. 1, 2; Mine & Smelter Supply Co. v. Parke & Lacey Co., 107 Fed. 881, 884, 47 C. C. A. 34, 36; McCrea v. Parsons, 112 Fed. 917, 919, 50 C. C. A. 612, 614; Merchants' Life Ass'n v. Yoakum, 98 Fed. 251, 260, 39 C. C. A. 56, 65; Sauntry v. U. S., 117 Fed. 132, 135, 55 C. C. A. 148, 151; Goddard v. Crefield Mills, 75 Fed. 818, 820, 21 C. C. A. 530, 532; 1 Greenleaf, Ev. § 445; 8 Enc. of Pl. & Prac. 104; Hopkinson v. Leeds, 78 Pa. 396; Fulton v. Bank, 92 Pa. 112, 115; People v. Edwards (Cal.) 73 Pac. 416; People v. Keith (Cal.) 68 Pac. 816; Stevens v. Walton (Colo. App.) 68 Pac. 834, 835; People v. McLean (Cal.) 67 Pac. 770, 771; Acklin v. McCalmont Oil Co. (Pa.) 50 Atl. 955, 956; State v. Hawkins (Wash.) 67 Pac. 814; Bowsher v. Chicago, B. & Q. R. Co. (Iowa) 84 N. W. 958,

960; Missouri Pac. R. Co. v. Fox (Neb.) 83 N. W. 744, 752; Boucher v. Clark Pub. Co. (S. D.) 84 N. W. 237, 240; Stubbings v. Curtis (Wis.) 85 N. W. 325, 327; Lake Erie & W. R. Co. v. Miller (Ind. App.) 57 N. E. 596, 598; State v. Savage (Or.) 60 Pac. 610, 615; Baker v. Sherman (Vt.) 46 Atl. 57, 62; Pennsylvania Co. v. Kennard Glass & Paint Co. (Neb.) 81 N. W. 372, 376, 377; Posch v. Southern Electric R. Co., 76 Mo. App. 601; People v. Dole (Cal.) 55 Pac. 581, 585, 68 Am. St. Rep. 50; State v. Ballou (R. I.) 40 Atl. 861, 862; Fisher v. Porter (S. D.) 77 N. W. 112, 114; State Bank v. Waterhouse (Conn.) 38 Atl. 904, 908, 66 Am. St. Rep. 82; East Dubuque v. Burhyte (Ill.) 50 N. E. 1077, 1078; Ernst v. Estey Wire-Works Co. (Sup.) 46 N. Y. Supp. 918, 920; Thalheim v. State (Fla.) 20 South. 938, 946; Devine v. Railway Co. (Iowa) 69 N. W. 1042; Crenshaw v. Johnson (N. C.) 26 S. E. 810.

The reason of the rule is that a witness during his cross-examination is the witness of the party who calls him, and not the witness of the party who cross-examines him. Wilson v. Wagar, 26 Mich. 457, 458; Campau v. Dewey, 9 Mich. 417, 418. The cross-examiner has the right to bind his opponent by the testimony of the witness upon cross-examination relative to every subject concerning which his opponent examined him in the direct examination. But he has no right to bind his opponent by the testimony of the witness during the cross-examina-. tion upon subjects relative to which his opponent did not inquire. If the cross-examiner would investigate these subjects by the testimony of the witness, he may and he must make him his own witness, and stand sponsor for the truth of his testimony. It is discretionary with the court to permit the cross-examiner to do this at the time he is conducting the cross-examination, because the time and the manner of the trial are within the discretion of the court. It is discretionary with the trial court to permit leading questions to be put to a hostile witness upon his direct examination. But in the federal courts the line of demarcation which limits a rightful cross-examination is clear and well-defined, and it rests upon the reason to which attention has been called. It is the line between subjects relative to which the witness was examined upon the direct examination and those concerning which he was not required to testify. It exists because within that line the party who calls the witness stands the sponsor for the truth of his testimony, while without that line he does not. It does not vary, at the discretion of the court, with any convenience or necessity of court or counsel, because no convenience or necessity can be conceived of which would not enable the cross-examiner to make the witness his own, and because to subject the rule to the discretion of the court or counsel is to abrogate it.

On the other hand, the right of cross-examination upon the subjects opened by the direct examination is invaluable, and it should be carefully preserved. Under the English and American systems of jurisprudence the opportunity to exercise the right of cross-examination is a condition precedent to the reception of the direct evidence of the witness. Heath v. Waters, 40 Mich. 457, 471; Sperry v. Moore's Estate, 42 Mich. 353, 361, 4 N. W. 13. The right of cross-examination is the great safeguard against fraud, false statements, and half truths resulting from statements of parts, and omissions of other parts, of

conversations and transactions, which are frequently more misleading and dangerous than direct falsehoods. It furnishes the cardinal and most effective means to discover and disclose the whole truth in all judicial investigations. It extends to the eliciting of every fact relative to the matters recited in the direct examination which either conditions, qualifies, or weakens the statements there made, or supplies any omission in the earlier testimony of the witness concerning the subjects there treated. Martin v. Elden, 32 Ohio St. 287; 1 Thompson on Trials, § 406. The testimony given by a witness on his cross-examination is the evidence of the party in whose behalf he is called, and not that of the party on whose account the cross-examination is conducted. The former, and not the latter, is bound by the evidence elicited upon the cross-examination. Wilson v. Wagar, 26 Mich. 457, 458; Campau v. Dewey, 9 Mich. 417, 418. Hence it is no answer to a refusal to permit a full cross-examination that the party against whom the witness was called to testify might have made him his own witness and then have propounded to him the questions to which he was entitled to answers upon the cross-examination. "No one is required to make his adversary's witness his own to explain or fill up a transaction he has partially explained already." He has the right to bind his adversary by the truth elicited from his own witness. Chandler v. Allison, 10 Mich. 460, 473; New York Iron Mine v. Negaunee Bank, 39 Mich. 644, 660.

Nor is it any answer to the refusal to permit a cross-examination of the character of that here in question that it would develop an affirmative defense. If upon the direct examination a witness is led to disclose a part of a single conversation or transaction the whole of which constitutes an affirmative defense or a counterclaim, that fact does not deprive the defendant of his right to prove the entire conversation or transaction by the same witness upon his cross-examination. Moreover, the rule which prohibits the proof of affirmative defenses upon cross-examination relates to those only which are pleaded by the party adverse to him who calls the witness. It never applies to a cross-examination by which the adverse party simply seeks to disprove, weaken, or modify the case against him which the witness himself has made. Wendt v. Chicago St. P., M. & O. Ry. Co., 4 S. D. 476, 484, 57 N. W. 226; Jackson v. Feather River W. Co., 14 Cal. 19, 24. The defendant in this case pleaded no affirmative defense and no counterclaim, and its aim upon the cross-examination was to disprove by the witness McNeece the case which that witness had made against it by requiring him to relate the entire transaction, a portion of which he had recited upon his direct examination. The rule which the plaintiff invokes here is inapplicable to the case in hand.

The testimony which the defendant sought to elicit was not cumulative, because no other witness testified, and no other knew, so far as this record discloses, whether or not the surveyors measured the distance from corner 4 of the Fortune to corner 4 of the Kokomo when they set the monuments. Nor, if it had been cumulative, would that fact have deprived the defendant of its right to elicit the testimony on a proper cross-examination from the plaintiff's witness for whose testimony the Fortune company stood sponsor. One is not deprived of his right of cross-examination by the fact that he may be able to obtain tes-

timony tending to establish the facts he seeks from his own witnesses. If he were, the right of cross-examination would in the large majority of cases cease to be. A party has the right, if he can do so by proper cross-examination, to prove the facts he relies upon by the cross-examination of the witness of his adversary, by whose testimony the latter is concluded, although he may be able to introduce other witnesses to establish the same facts.

None of the reasons why its witness should not have answered the question propounded to him which counsel for the plaintiff urged upon us commend themselves to our judgment. They had requested McNeece on his direct examination to describe the manner in which the monuments were set when the survey for the patent was made, and he testified to the method of the survey and to the setting of each of the four posts in its place. Upon cross-examination he testified, readily and without objection, about the setting of the posts and the measurements made by the surveyors, until he came to the question whose answer seemed likely to tend to weaken or disprove the case made by his direct testimony, and there he was stopped by the objection of counsel for the plaintiff. The question which he was asked related to the subject of his direct examination, to the res gestæ which he had in part there related, and it tended to qualify and weaken the case which his direct testimony had made. Under all the rules it fell far within the pale of the right of cross-examination, and the refusal of the court to permit the witness to answer it cannot be lawfully sustained.

Nor can counsel escape a reversal of the judgment below upon the theory that, although this ruling was erroneous, it was not injurious to the defendant, and that for two reasons: In the first place, it is the general rule of the federal courts that error produces prejudice, and that it cannot be disregarded unless it appears beyond a doubt that the error complained of did not prejudice and could not have prejudiced the rights of the party who assigns it. Boston & Albany Railroad v. O'Reilly, 158 U. S. 334, 337, 15 Sup. Ct. 830, 39 L. Ed. 1006; Deery v. Cray, 5 Wall. 795, 807, 18 L. Ed. 653; Gilmer v. Higley, 110 U. S. 47, 3 Sup. Ct. 471, 28 L. Ed. 62. In the second place, the presumption is that the answer to a question propounded would have been favorable to the party who asked it, that he would have followed the inquiry thus opened farther, and that his cause was prejudiced by the suppression of the investigation. Martin v. Elden, 32 Ohio St. 282, 287; Buckstaff v. Russell, 151 U. S. 626, 637, 14 Sup. Ct. 448, 38 L. Ed. 292; Atchison, Topeka & S. F. R. Co. v. Phipps, 125 Fed. 478, 480, 60 C. C. A. 314.

There is no escape from the conclusion that the ruling of the court which refused to permit the defendant to elicit an answer to the question he propounded upon cross-examination is reversible error. If there were doubt relative to the question concerning this cross-examination which we have been considering, the terse and lucid opinion of Mr. Justice Campbell regarding it in Chandler v. Allison, 10 Mich. 460, 473, would persuade. He said:

"Whenever an entire transaction is in issue, evidence which conceals a part of it is defective, and does not comply with the primary obligation of the oath, which is designed to elicit the whole truth. If the witness were, as he always may be, requested to state what he knows about it, he would

not do his duty by designedly stopping short of it. Any question which fills up his omissions, whether designed or accidental, is legitimate and proper on cross-examination. When the answers are given, the nature and extent of the transaction becomes known from a comparison of the whole, and each fact material to a comprehension of the rest is equally important and pertinent. A party cannot glean out certain facts which, alone, would make out a false account, and save his own witness from the sifting process by which only those omissions can be detected. There could be no such thing as cross-examination if such a course were allowed; no one could expose a fraudulent witness for his dishonest concealments; and every one who knew of such practices would be driven to the necessity of calling, in his own behalf, an adverse witness to show his own concealments, whom, if perjured, he could not impeach. The absurdity of such a process is too plain to need pointing out. No one can be compelled to make his adversary's witness his own to explain or fill up the transaction he has partially explained already."

The statutes of Colorado limited the width of the Fortune claim to 150 feet on each side of the center of the vein or crevice. 2 Mills' Ann. St. Colo. § 3149. After the owner of the claim had testified that the original post at corner 3 was located where the round blazed stake was standing, a point about 23 feet farther north than the location of that corner indicated by the remaining monuments and the courses and distances, and after he had testified that the corner posts placed at the time of the survey for patent were set at about the same places as the corner stakes driven at the time of the original location of the claim, and after he had testified to the location of his discovery shaft, counsel for the defendant offered in evidence the original location certificate of the claim, dated June 7, 1880, and two amended certificates, one dated December 22, 1881, and the other February 15, 1882, all signed by the witness, and these certificates were rejected upon the ground that they tended to contradict the terms of the patent. But the offer of these certificates was not made to contradict or vary any of the terms of the patent, but simply to weaken and rebut the case made by the witness who had, by his own testimony that the original monument which marked corner 3 was about 23 feet farther north than the description in the patent located it, raised an ambiguity which both parties were endeavoring to make certain by evidence. The amended location certificates made and signed by this witness and others within two months of the survey for patent, to which he had testified, recited, one that the locators claimed 1,500, and the other that they claimed 1,465, lineal feet along the Fortune lode, together with 150 feet on the north side and 150 feet on the south side of the middle of said vein at the surface, and all veins, lodes, ledges, or deposits, and surface ground within the lines of said claim 395 feet running north 88 degrees 30 minutes west (according to the December certificate), and north 88 degrees 48 minutes west (according to the February certificate), from center of discovery shaft, and 1,100 feet running south 88 degrees 30 minutes east (according to the December certificate), and 1,070 feet running south 88 degrees 48 minutes east (according to the February certificate), from the center of the discovery shaft. The difference in the courses recited in the two certificates was insufficient to affect their evidence, and it is plain that, if the line runing east from the center of the discovery shaft described in these certificates intersected the east line of the claim at a point about 175 feet south of the round stake, that fact would tend to prove that

the witness McNeece was mistaken in his testimony that this stake was at the place where the original monument was located, while, if that line would intersect the east line of the claim about 150 feet south of the round stake, that fact would tend to corroborate his evidence. The certificates were offered to establish the former fact, not to contradict, but to corroborate and sustain, the description in the patent and in the field notes, and to rebut the testimony of this witness by which the plaintiff was seeking to apply them to a tract of land which upon their face they did not describe. The evidence was competent and material for the purpose for which it was offered, and it should have been received.

The result of our examination of this record is that this case must be again tried. At the coming trial two important issues may be presented: First, whether or not the round stake stands in the same place in which the square carved post called for by the field notes as the mark of corner No. 3 was originally located; and, second, whether the defendant intentionally or innocently took ore from the plaintiff's claim. Upon the first issue the location of corners 3 and 4 by means of the monuments at corners 1 and 2 and the courses and distances described in the patent and in the field notes, run both forward and backward from corners 1 and 2, the relations of the disputed corners and lines upon the two theories advanced by the respective parties to the various ties and references in the patent and in the field notes of the Fortune claim, the testimony of the witnesses who knew the location of the original monuments, and other evidence which directly tends to prove or disprove the theory of either party, should be received. Upon the second issue evidence of the knowledge and information which the managing officers of the defendant had relative to the location of the disputed lines and corner before and during the removal of the ore, evidence of their relevant acts and omissions during this time, and testimony of their intent and purpose in taking the ore, will be competent evidence.

The measure of damages for the reckless, willful, or intentional taking of ore from the land of another without right is the enhanced value of the ore where it is finally converted to the use of the trespasser. The measure of damages for wrongfully taking ore from the land of another through inadvertence or mistake, or in the honest belief that one is acting within his legal rights, is the value of the ore in the mine. The wrongful taking of the ore, in the absence of all other evidence, raises a presumption of fact that the trespasser took it intentionally and willfully. This presumption, however, is a disputable one, which evidence may so completely overcome that it will become the duty of the court to instruct the jury that it cannot prevail. The trespasser may overcome it, and may limit the recovery against him to the lower measure of damages, by proof presented on behalf of the owner, or on his own behalf, that he took the ore unintentionally, in good faith, in the honest belief that he was lawfully exercising a right which he possessed. When this issue is presented for determination, the question is, did the trespasser take the ore from his neighbor's land recklessly, or with an actual intent to do so, or inadvertently or unintentionally, or in the honest belief that he was exercising his own right? If the former he was a willful trespasser, if the latter he was an innocent trespasser, within the meaning of the rule relative to the measure of damages. U. S. v. Homestake Min.

Co., 117 Fed. 481, 482, 485, 486, 54 C. C. A. 303, 304, 307, 308; Golden Reward Min. Co. v. Buxton Min. Co., 97 Fed. 413, 422, 38 C. C. A. 228; St. Clair v. Cash Gold Min. & Mill. Co. (Colo. App.) 47 Pac. 466, 468, 469.

The rules upon this subject have been again stated, because some discussion has arisen at the bar whether or not a jury may lawfully infer that a trespass was willful and intentional from the single fact that the trespasser failed to exercise ordinary care in ascertaining the limits of his victim's land or rights. Our answer is that the wrongful taking raises the presumption of an intentional and willful trespass, and that negligence in ascertaining the limits of the land or of the rights of the owner is competent evidence upon the issue. but that negligence which amounts to mere inadvertence, without evil intent or recklessness, is not in itself sufficient proof to sustain a finding of fraud, bad faith, willfulness, or evil intent in committing the trespass. In Durant Min. Co. v. Percy Consol. Min. Co., 35 C. C. A. 252, 253, 93 Fed. 166, 167, this court held that a jury was not required to find a trespass to be willful from the negligence of the trespasser in ascertaining the line between his own property and that of the owner whose ore he took; and we said, in the course of the discussion of that question, that "a jury may lawfully infer that a trespasser had knowledge of the right and title of the owner of the property upon which he entered, and that he intended to violate that right, and to appropriate the property to his own use, from his reckless disregard of the owner's right and title, or from his failure to exercise ordinary care to discover and protect them." It was not, however, our intention to hold that lack of ordinary care alone would justify a finding that a trespasser was guilty of that bad faith, fraud, knowledge, or intent which renders him liable for the higher measure of damages, or to go farther than to intimate that the negligence of the trespasser, like all his other acts and omissions, is competent evidence for the consideration of the jury in determining the real issue whether his trespass was intentional or reckless on the one hand, or inadvertent or innocent on the other. While mere negligence which is synonymous with inadvertence will not alone sustain a finding of willful trespass, one may be "so far negligent as to justify an inference that he acted knowingly and intentionally" and to warrant a jury in finding his trespass willful. Golden Reward Min. Co. v. Buxton Min. Co., 97 Fed. 413, 422, 38 C. C. A. 228, 238. An intentional or reckless omission to exercise care to ascertain the boundaries of his victim's land or rights, for the purpose of maintaining ignorance regarding them, or a reckless disregard of them, is as fatal to the claim of a trespasser to limit the recovery of damages against him to the lower measure as an intentional and willful trespass. These rules and principles, applied to the evidence to be produced upon the coming trial, will, we trust, result in a fair and impartial hearing of the issues presented, and a just and righteous judgment. The judgment below is reversed, and the case is remanded for a new trial.

HOOK, Circuit Judge (concurring). I concur in the result announced, and also in what is said in support thereof, excepting in one particular. I concur in the view that reversible error was committed in the

exclusion of the question propounded to the witness, McNeece on cross-examination. An authority directly in point is Eames v. Kaiser, 142 U. S. 488, 12 Sup. Ct. 302, 35 L. Ed. 1091. As applicable to this matter, it is said in the foregoing opinion that a fair and full cross-examination of a witness upon the subjects of his examination in chief is the absolute right, and not the mere privilege, of the party against whom he is called, and a denial of this right is a prejudicial and fatal error. To this I assent.

But it is also said:

"The converse of this rule is equally controlling. In the courts of the United States the party in whose behalf a witness is called has the right to restrict his cross-examination to the subjects of his direct examination, and a violation of this rule is reversible error."

I am unable to agree that this is a correct statement of the law. The questions presented by the record in the case before us do not require any expression as to what is said to be the converse of the rule which is actually applied and enforced, but inasmuch as it appears in the foregoing opinion, and a similar difference of opinion arose in Balliet v. United States (decided at this term) 129 Fed. 689, it is not inappropriate that my position in respect thereto be definitely stated.

It is undoubtedly the settled rule in the courts of the United States that the right of cross-examination of a witness is limited to the subjects of his direct examination. This rule finds adequate support in Railroad v. Stimpson, 14 Pet. 448, 461, 10 L. Ed. 535, and in Houghton v. Jones, 1 Wall. 702, 706, 17 L. Ed. 503. Moreover, with some few exceptions, the rule prevails in all of the states. But from this rule is deduced the conclusion, to which I am unable to assent, that, if a trial court fails to confine the cross-examination of a witness to matters concerning which he testified in his principal examination, prejudicial and fatal error is committed. The position of Judge THAYER and the writer of this opinion is that, after a cross-examining party has been accorded all of his rights as limited by the rule of Railroad v. Stimpson and Houghton v. Jones, supra, whether the cross-examination may then take a wider scope or latitude is generally a matter within the sound discretion of the trial court, and error is not committed unless such discretion is abused. This position finds overwhelming support in the decisions of almost every court of last resort in the United States, in the views of the text-writers, in the everyday proceedings of trial courts, and in the general concurrence of the bar. That a trial court is given a broad discretion in controlling the latitude of a cross-examination has become an axiom of the practice. In the exercise of that discretion within its legitimate scope, no error, reversible or otherwise can be committed. It may not be said that a court is possessed of a discretion to commit error. The doing of whatever under the law it has the power to do or the discretion to do is not erroneous. Error may be successfully predicated upon an abuse of discretion, but not upon the reasonable exercise thereof. It may be safely asserted that, in nearly every case in which the rule that a cross-examination is limited to the subjects of the examination in chief is declared, the appellant was pressing for a latitude which the court in its discretion declined to allow, and that in most of the others there appeared to be such an abuse

of discretion as constituted reversible error. It rarely happens that a reversal is awarded because of a mere latitude of cross-examination, if the subjects thereof were pertinent to the issues. That there is a broad field of discretion between the limits of the affirmative, positive rights of a cross-examining party on the one side, and the line of abuse and injustice upon the other is indisputable.

In Rea v. Missouri, 17 Wall. 532, 542, 21 L. Ed. 707, it was said:

"Still, where the cross-examination is directed to matters not inquired about in the principal examination, its course and extent is very largely subject to the control of the court, in the exercise of a sound discretion, and the exercise of this discretion is not reviewable on writ of error."

In Wills v. Russell, 100 U. S. 621, 626, 25 L. Ed. 607, the cases of Railroad v. Stimpson and Houghton v. Jones, supra, which hold that a cross-examination is limited to matters stated in the examination in chief, are cited and approved, but it is expressly said that they do not decide the converse of the proposition. The court, speaking through Mr. Justice Clifford, said:

"It has been twice so ruled by this court, and is undoubtedly a valuable rule of practice, and one well calculated to promote regularity and logical order in jury trials; but it is equally well settled by the same authorities that the mode of conducting trials, and the order of introducing evidence, and the time when it is to be introduced, are matters properly belonging very largely to the practice of the court where the matters of fact are tried by a jury. Both of the cases referred to by the plaintiffs show that the judgment will not be reversed merely because it appears that the rule limiting the cross-examination to the matters opened by the examination in chief was applied and enforced; but those cases do not decide the converse of the proposition, nor is attention called to any case where it is held that the judgment will be reversed because the court trying the issue of fact relaxed the rule and allowed the cross-examination to extend to other matters pertinent to the issue. Cases not infrequently arise where the convenience of the witness, or of the court, or the party producing the witness, will be promoted by a relaxation of the rule, to enable the witness to be discharged from further attendance; and, if the court in such a case should refuse to enforce the rule, it clearly would not be a ground of error, unless it appeared that it worked serious injury to the opposite party."

In Davis v. Coblens, 174 U. S. 719, 726, 19 Sup. Ct. 832, 835, 43 L. Ed. 1147, it is said:

"Thereupon defendant's counsel cross-examined him at great length, against the objection of plaintiffs, regarding his business of buying and selling real estate, and the extent of it and character. The ruling of the court permitting the cross-examination is assigned as error. We see no error in it. The question of plaintiffs' counsel was a general one, and opened many things to particular inquiry. The extent and manner of that inquiry was necessarily within the discretion of the court, even though it extended to matters not connected with the examination in chief. In Rea v. Missouri, 17 Wall. 532 [21 L. Ed. 707], it was said: 'Where the cross-examination is directed to matters not inquired about in the principal examination, its course and extent are very largely subject to the control of the court, in the exercise of a sound discretion, and the exercise of that discretion is not reviewable on a writ of error.'"

In Homestake Min. Co. v. Fullerton, 69 Fed. 923, 16 C. C. A. 545, this court said:

"Trial courts should be allowed a liberal discretion in determining the latitude to be given to a cross-examination, and particularly in determining the form in which questions should be propounded to a witness which are simply

designed to impeach his credibility. We are not prepared to say, therefore, that the trial court exceeded its discretionary powers in sustaining the objection to the several questions above quoted."

The doctrine was again referred to with approval by this court in Sauntry v. United States, 117 Fed. 132, 135, 55 C. C. A. 148.

In Seymour v. Lumber Co., 58 Fed. 957, 7 C. C. A. 593, it was said by the Circuit Court of Appeals of the Sixth Circuit:

"The course and extent of cross-examination, when directed to matters not inquired about in the principal examination, is very largely subject to the control of the court, in the exercise of a sound discretion, which is not reviewable on writ of error."

As illustrative of another phase of the same doctrine, Judge Taft said, concerning the refusal of a trial court to allow a re-examination of a witness:

"This subject was collateral to the main issue, and largely within the discretion of the court." Sutherland v. Round, 57 Fed. 467, 6 C. C. A. 428.

In Hart v. Atlas Knitting Co., 77 Fed. 399, 23 C. C. A. 198, the Court of Appeals for the Second Circuit said:

"It is true that no issue was raised by the pleadings as to the cancellation of orders with other persons, but courts have universally recognized the necessity of leaving the course and extent of a cross-examination very largely to the discretion of the trial judge."

The extent to which a witness may be cross-examined is within the discretion of the trial court, and it will not be reviewed unless the discretion has been abused. Root v. Railway, 183 Mass. 418, 67 N. E. 365; State v. Haab, 105 La. 230, 29 South. 725; Pennsylvania Co. v. Newmeyer, 129 Ind. 401, 28 N. E. 860; Hanchett v. Kimbark, 118 Ill. 129, 7 N. E. 493; State v. Bunker, 7 S. D. 642, 65 N. W. 33; State v. Pfefferle, 36 Kan. 90, 12 Pac. 406; Wroe v. State, 20 Ohio St. 460; Hanoff v. State, 37 Ohio St. 178, 41 Am. Rep. 496; White v. McLean, 57 N. Y. 671; City v. Gavin, 182 Ill. 232, 54 N. E. 1035; Lesser v. Furniture Co., 68 N. H. 343, 44 Atl. 490.

The rule was interpreted by Mr. Justice Sharswood in Jackson v. Litch, 62 Pa. 455, as follows:

"A party will not be permitted to lead out new matter, constituting his own case, by the cross-examination of his adversary's witnesses. Ellmaker v. Buckley, 16 Serg. & R. 72; Floyd v. Bovard, 6 W. & S. 75; Mitchell v. Welch, 17 Pa. 339 [55 Am. Dec. 557]; Turner v. Reynolds, 23 Pa. 199. Yet I have not been able to find a single case in which this court has reversed on that ground. It has generally been considered as a matter within the sound discretion of the court below, and in Schnable v. Doughty, 3 Pa. 392, though the Supreme Court thought the rule had been violated, they distinctly refused to reverse. In Helser v. McGrath, 52 Pa. 531, the present Chief Justice remarked: 'These rules, as well as all others on the order of examination of witnesses and the introduction of testimony, have for their object the eliciting of truth, and the preservation of the equality of the rights of parties in trials in courts. Much, however, must still be left to the discretion of the judge. Neither the rule nor the exception must be allowed, if it can be prevented, unduly to prejudice the parties. The exercise of a prudent discretion by the judge is the only guard against this in many cases. Although we will not reverse in this case for an excess of latitude in the cross-examination, because we do not discover the injury from it, yet we think it was very great, and beyond the limits of the authorities generally. Doubtless the learned judge thought he saw the propriety of allowing it, and we

cannot say he was wrong, for we have not his means of judging.' It may be concluded from these authorities that, in order to reverse, it must be an extreme case, in which discretion has been abused, and in which it is apparent that the party has been injured."

This case was cited and the doctrine reaffirmed in Bohan v. Avoca, 154 Pa. 404, 26 Atl. 604.

It is said in the concurring opinion in Balliet v. United States, supra, that, if the rule limiting a cross-examination to the subjects of the examination in chief is relaxed or suspended when the trial court is of the opinion that it is necessary or convenient to do so, the rule is abrogated and ceases to be a rule at all; that such discretion is not committed to a court. But there are other rules in the law of evidence equally well settled, the rigid enforcement of which is by universal consent committed to the discretion of the trial courts. Thus in Ballew v. United States, 160 U. S. 187, 193, 16 Sup. Ct. 263, 40 L. Ed. 388, the court recognized and applied the well-known rule that a re-examination of a witness should be confined to matters to which the cross-examination related, and that an attempt to draw out new matter is, in the language of that court, clearly improper. 1 Greenleaf on Evidence, § 467. Though this is a recognized rule of the law of evidence, nevertheless all will agree that its suspension or relaxation in actual practice is almost as frequent as the administration of the oath to witnesses.

Again, it is a general rule that leading questions on direct examination are not permissible. That rule was applied by this court in Parker v. Brown, 85 Fed. 595, 29 C. C. A. 357. But it was said by the Supreme Court in Railroad v. Urlin, 158 U. S. 271, 273, 15 Sup. Ct. 840, 39 L. Ed. 977, that the granting or refusal of permission to ask such questions is within the discretion of the trial court, and that there must appear a plain case of abuse of discretion in order to justify the claim that error was committed; and it was said by this court in Eli Mining & Land Co. v. Carleton, 108 Fed. 24, 47 C. C. A. 166, that an objection to a question as leading is "never regarded by an appellate court."

It seems that the true theory is that these rules are intended primarily to limit the positive rights of the parties when engaged in the examination or cross-examination of witnesses, but are not intended to impose an unyielding limitation upon the discretion of a court as exigencies arise during the progress of the trial. By denying to trial courts a discretion in the enforcement of these rules—and I do not conceive that there is any difference between them which is material to the matter under discussion—we would add immeasurably to that great mass of technicalities which unfortunately encroach upon, and not infrequently entirely obstruct, the channels of justice. The object of all evidence in courts of justice is that the truth may be elicited, and this is of much more importance, than the mere order in which the evidence is adduced or the latitude allowed in the examination of witnesses. I am of the opinion that when one of these rules of evidence is relaxed or suspended by a trial court, and its action in that regard is challenged on appeal, the appellate court does not proceed upon the assumption that reversible error was committed, but that, on the contrary, it is presumed that error was not committed, unless it clearly appears that the discretion of the trial court was abused.

THAYER, Circuit Judge (dissenting in part). I am unable to concur in the conclusion announced on all of the questions that are considered and decided in the foregoing opinion. I do not concur in the view that the instruction of the trial judge relative to the post at the corner No. 3 of the Fortune lode claim was an erroneous instruction. The patent granting the Fortune lode, and the original and amended field notes of the survey on which the patent was founded, were read in evidence, without objection; and it is conceded, in the foregoing opinion, that the case stands as though the field notes were written into the description of the patent. Therefore the patent declares that corner No. 3 of the claim as granted is marked by a post four inches square, four feet long, set two feet in the ground, and having the number of the corner and the number of the survey cut therein. When the boundaries of the claim were run, however, according to the courses and distances mentioned in the patent, no post whatever was found at corner No. 3 as thus located, but within 23 feet of that point, and to the northwest, a post was found which was squared on one side and surrounded by a mound of stones, and bore the number of the corner and the survey written thereon in pencil. One witness, who was present at the survey of the Fortune claim, testified that this was the very post was erected by the surveyor to mark corner No. 3 when the claim was surveyed, and that it was at the point where the surveyor placed it. Several other witnesses, who lived in the vicinity and were familiar with the locality, gave evidence tending to show that the post had been standing in the same position since the date of the survey, and had been seen repeatedly by them since that time. One of these witnesses, a surveyor by profession, testified, in substance, that he had seen this post on several occasions since 1887, and had recognized it as the established corner of the Fortune claim by tying other surveys made by him to that corner, and that he had driven a nail into the post, to identify it, as early as 1887, and that he found the nail in the post as late as 1901, having tied other surveys to that corner in the meantime.

Now, on this state of facts, when the learned trial judge came to charge the jury, he instructed them as follows:

"The court instructs the jury that monuments control the courses and distances mentioned in a patent, and if the monuments called for in the patent or field notes of the original survey are found upon the ground, or supplied by proof of their former existence, then distances must be lengthened or shortened and courses changed to conform with the location of said monuments; and in this connection the court instructs you that a stake, such as described by the witnesses in this case as located on corner No. 3, is sufficient to meet the calls of the patent; and, if they believe from the evidence that such stake is at the place at which corner No. 3 was located by the deputy mineral surveyor in making survey for patent, then the jury may find that the line of the patent should be extended to said corner No. 3."

In the same connection he instructed the jury:

"That it is the lines actually run out and marked upon the grounds by the surveyor making survey for patent, when such lines can be identified, and not the lines which said surveyor reports in his field notes, which control and identify the granted premises. If, therefore, the jury believe from the evidence that the deputy mineral surveyor, in making survey for the Fortune patent, placed his monument marking corner No. 3 at the point where said monument is found to-day, and where the same is placed by plaintiff's maps

and plats, then your finding should be for the plaintiff; that it is the owner of the Fortune claim to corner No. 3 as indicated by the monument now existing upon the ground."

The trial judge declined to give an instruction in favor of the plaintiff in error which is quoted above in the majority opinion, and he also declined to give an instruction which was asked by the plaintiff in error to the effect that corner No. 3 of the Fortune lode mining claim should be re-established by running from corner No. 2 on the courses and distances given in the patent, "unless [the jury found] from a preponderance of the evidence that the stake as contended for by the plaintiff, and which now stands upon the ground, does comply with the description of said post as set out in the patent." In other words, plaintiff in error, who was the defendant below, asked the trial court, first, to permit the jury to determine whether the post standing upon the ground at corner No. 3 complied sufficiently with the description of the post at that corner as given in the patent, and, in the second place, to declare, as a matter of law, that the post did not so comply.

On the state of facts above narrated, I am of opinion that the trial court was fully warranted in instructing the jury, as it did in substance, that if the post found on the ground at corner No. 3 was at the place where the surveyor placed his monument at the time of the survey to mark corner No. 3 of the claim, then the existing post might be regarded as answering the calls of the patent, and that the boundary of the claim should be extended thereto. There would seem to be little justice in depriving the plaintiff below, who is the defendant in error here, of valuable property by adhering strictly to courses and distances, which are apt to be to some extent erroneous, if the jury were satisfied by reliable testimony, as they appear to have been, that the artificial monument found on the ground was in the exact spot where the surveyor had placed it to mark corner No. 3 at the time he surveyed the claim for patent. The patent and field notes showed that the corner in question had been marked at the time of the survey by an artificial monument, to wit, a post of a certain description; but when the corner was located by following courses and distances, no post whatever was found at that point, or evidence that one had ever been erected at that place. This fact alone created some uncertainty—a doubt as to the accuracy of the course. Near by, however, was found a monument, that had evidently been set by a surveyor, which corresponded generally with the monument called for in the patent. It was so near as to justify an inference that it was the post referred to in the patent, and that, as frequently happens in running lines over a rough country, the course and distance from corner No. 2 to corner No. 3 had been read erroneously. These facts, in my judgment, warranted the introduction of oral proof to the effect that the monument found on the ground was the one set by the surveyor, or was at the very spot where he had placed a post to mark the corner. Proof to this effect was in fact received, without objection from anybody that the reception thereof violated any rule of evidence, and it was ample to establish the fact which it was intended to establish. The doctrine announced in the foregoing opinion comes dangerously near declaring that if a monument set by a surveyor to mark the boundary of property is accidentally destroyed, or is not

described to a nicety, the owner loses his property, although he may be able to prove to a certainty exactly where the monument was set, or that the monument remains where it was placed by the surveyor but was not described accurately. I am unable to concur in this view.

Furthermore, I have not been able to conclude that a material or prejudicial error was committed by the trial court in refusing to permit the witness McNeece to answer the question, on his cross-examination, if, when the Fortune claim was surveyed, the surveyor measured the distance from corner No. 4 of that claim to corner No. 4 of the Kokomo claim, which distance, as the patent declared, was 196 feet on a certain course. Conceding that an answer to this question might have been properly allowed, it is a different question whether the court committed a reversible error in sustaining an objection to the interrogatory. The object which the plaintiff in error, who was the defendant below, had in view in asking this question, appears to have been to show that if the distance between these corners of the Kokomo and the Fortune was as specified—that is to say, 196 feet—then corner No. 4 of the Fortune would be located about 323 feet distant from the post which was found at corner No. 3, making the claim of excessive width; whereas if corner No. 4 of the Fortune was located according to this call of the patent— that is to say, 196 feet from corner No. 4 of the Kokomo—it would be in the neighborhood of 300 feet from corner No. 3 of the Fortune as located by following courses and distances, which the defendant insisted should be followed. In other words, the evidence tended, in some measure, to confirm the contention of the defendant below as to the proper location of corner No. 3, while it tended in some measure to overcome plaintiff's contention on the same point. But as I read the record, the fact which the defendant below wished to establish was conclusively shown afterwards, by the testimony of a surveyor who had measured the distance in question, that if corner No. 4 of the Fortune was located 196 feet distant from corner No. 4 of the Kokomo, then it would be at a point 328 feet distant from the post which, as the plaintiff claimed, was set to mark corner No. 3 of the Fortune. There seems to have been no substantial controversy on this point, so that it is difficult to see in what manner the defendant below was prejudiced by the refusal to allow McNeece to answer the question if the distance between the two corners was measured. The fact which the defendant wished to establish, and from which it desired to draw inferences, was established by authentic testimony, and does not seem to have been seriously disputed. I am of opinion, therefore, that it is overtechnical, unnecessary, and unwise to hold that the refusal of the trial court to permit McNeece to answer this particular question on his cross-examination, was a material error.

Incidentally, the foregoing opinion contains the statement—although the case at bar does not seem to involve a discussion or decision of that question—that "the party on whose behalf a witness is called has the right to restrict his cross-examination to the subjects of his direct examination, and a violation of this right is reversible error." This statement, besides being unnecessary, is, in my judgment, erroneous, in that it states the rule too broadly, and is calculated both to mislead practitioners and cause them to sue out writs of error on insufficient grounds. While it is true that it is customary in the federal courts to limit the

cross-examination of a witness to matters inquired of in chief, yet it is not true that every relaxation of this rule constitutes a reversible error. As Mr. Justice Clifford well observes in Wills v. Russell, 100 U. S. 621, 626, 25 L. Ed. 607:

"Cases not infrequently arise where the convenience of the witness or of the court or the party producing the witness will be promoted by a relaxation of the rule, to enable the witness to be discharged from further attendance; and, if the court in such a case should refuse to enforce the rule, it clearly would not be a ground of error, unless it appear that it worked serious injury to the opposite party."

No federal case has been cited, and none, I apprehend, can be found, where the judgment of a trial court has been reversed solely because a question was asked of a witness on cross-examination about a matter not inquired of in chief. The cases cited in support of the doctrine announced in the foregoing opinion are those where a litigant was complaining in the appellate court because the trial court did not permit a witness to testify on cross-examination about matters to which he had not been interrogated in chief, and the rulings were upheld. Trial judges will often find it to be convenient, and even necessary, to permit a witness to be asked a question or questions on cross-examination relative to a subject about which he has not testified on his direct examination. They must of necessity exercise some discretion on such occasions, and the true doctrine is, in my opinion, that a judgment will not be reversed on appeal because of some relaxation of the general rule, unless the trial court abuses its discretion and permits a witness to be interrogated on his cross-examination about matters not gone into in chief, when there was no reasonable excuse for so doing, and when it is apparent that the opposite party was thereby prejudiced.

I have not been able to conclude that the exclusion of the location certificates was such an error as warrants a reversal of the judgment. It is conceded by learned counsel for the plaintiff in error that the location certificates cannot be introduced for the purpose of contradicting the patent as to the area of the claim, or in any other respect, and such is clearly the law. Doe v. Waterloo Mining Co. (C. C.) 54 Fed. 935, 940; Waterloo Mining Co. v. Doe, 27 C. C. A. 50, 82 Fed. 45; Golden Reward Mining Co. v. Buxton Mining Co. (C. C.) 79 Fed. 868, 874; Lindley on Mines (2d Ed.) § 778. But it is claimed, as I understand, that the location certificates contained an important admission on the part of McNeece, who was one of the locators, which tended to rebut his statement that the post found on the ground at corner No. 3 of the claim was where it was originally located by the surveyor. The admission, as I understand, is contained in the first paragraph of the amended location certificate, which declares, in substance, that McNeece and others had made a location by right of discovery, in compliance with the act of Congress and the local customs, claiming 1,500 linear feet on the Fortune lode vein "along the vein thereof with all its dips, angles and variations as allowed by law, together with 150 feet on each side of the middle of said vein at the surface so far as can be determined from present developments * * * within the lines of said claim 395 feet running N. 88° 30′ W. from center of discovery shaft and 1105 feet running S. 80° 30′ E. from center of discovery shaft." It is said that the

course of the center line of the vein as thus given corresponds with the course given in the patent from corner No. 2 to corner No. 3, the two lines being practically parallel, and that the center line of the vein projected would intersect the east end line more than 150 feet south of the post found at corner No. 3, which the plaintiff below claimed to be the true corner as actually located by the surveyor. It will be observed, however, from the language employed in the location certificate, "so far as can be determined from present developments," that when this location certificate was prepared the course of the vein—that is to say, the middle of the vein at the surface—could only be approximately determined. So far as developments at that time had disclosed, the middle thread of the vein was believed to be about parallel with the line from corner No. 2 to corner No. 3. It is quite apparent, from the location certificate, that McNeece and his fellow locators intended to claim 150 feet on each side of the center of the vein at the surface, wherever subsequent developments might prove the center line to be. He or the surveyor supposed at the time the course of the vein to be about N. 88° 30' W. from the center of the discovery shaft. I fail to see that the fact that this center line of the vein, as described by the location certificates, intersects the east end line of the claim more than 150 feet south of the post, was entitled to any greater significance, or that it gave any increased weight to the fact, which was not denied, that the line drawn from corner No. 2 to corner No. 3 of the claim, following courses and distances, established corner No. 3 about 23 feet south of the post which was found on the ground. The actual course of the vein was founded on supposition largely. As the location certificates show, it was believed to be about parallel with the north side line as the claim had been surveyed, and it was so described probably without any survey of the center line of the vein at the surface because it could not be accurately determined. The real point in dispute between the parties, as it seems to me, was whether the post which was found at the corner No. 3 was at the spot where the surveyor placed it to mark the corner, and that issue, in my judgment, was fairly tried.

I concur in what is said in the foregoing opinion concerning the proper rule for the admeasurement of damages.